**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

FILED

01 NOV 30  PM 4: 22

N.D. OF ALABAMA

| | | |
|---|---|---|
| SABRINA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-00-S-2880-S |
| | ) | |
| SITEL CORPORATION, | ) | ENTERED |
| | ) | |
| Defendant. | ) | NOV 3 0 2001 |

**MEMORANDUM OPINION**

Plaintiff, Sabrina Brown, was terminated by defendant SITEL Corporation from employment as a customer service representative for allegedly violating company policy. Plaintiff, an American citizen of African ancestry, contends that defendant discriminated against her on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. The action presently is before the court on defendant's motion for summary judgment. Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes the motion is due to be granted.

**I. STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

When adjudicating a motion for summary judgment, courts may only consider evidence that would be admissible at trial. *See, e.g., Victoria L. by Carol A. v. District School Board*, 741 F.2d 369, 373 (11th Cir. 1984). *Samuels v. Doctors Hospital, Inc.*, 588 F.2d 485, 486 & n.2 (5th Cir. 1979); *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976) ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Roucher v. Traders & General Insurance Co.*, 235 F.2d 423, 424 (5th Cir. 1956) ("[E]vidence inadmissible on a hearing of the case would generally be inadmissible on a motion for summary judgment, except that the court may hear the matter on affidavits...."); *Soles v. Board of Commissioners of Johnson County, Georgia*, 746 F. Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial.").

With the foregoing standards in mind, the following facts are either not disputed or are stated in the light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Sabrina Brown was employed by SITEL Corporation in Birmingham, Alabama, beginning on December 6, 1999. She was assigned as a customer service representative for Capital One Financial Corporation ("Capital One"), a credit card issuer.[1] Brown answered "inbound" credit card account calls from Capital One card-holders[2] — *i.e.,* calls from customers who telephoned a toll-free number with inquiries about their credit card accounts.

Incoming telephone account inquiries are logged by a computer system. When a Capital One customer calls the toll-free customer service telephone number, he or she is prompted to enter the account number. The telephone number from which the customer places his or her call is recorded by a computer on the customer's individual account records as a security measure.

Capital One has an ethics policy to which Brown was required to adhere.[3] One of the provisions of that policy prohibits "self-dealing" by employees. That section reads as follows:

> **Definition:** Self-dealing occurs when any Capital One associate conducts business in a manner that places the associate's interest above the interest of Capital One.
>
> **Credit and Financial Transactions:** Associates may not approve extensions of credit, waivers of finance or service charges or fees, or otherwise deal for themselves or their friends, relatives or co-workers. Associates are also prohibited from personally extending credit to any customer whom the associate knows applied for and was denied credit by Capital One. Efforts should be made by all associates to avoid even the appearance of impropriety when dealing with personal friends, family members or co-workers.[4]

Brown obtained two Capital One credit cards of which she was the sole authorized user after she

---

[1] Brief in Support of Defendant's Motion for Summary Judgment (doc. no. 17), Ex. 1, at 53-54. It appears that defendant provides customer service for the holders of credit cards issued by Capital One Financial Corporation, but the exact nature of the relationship between the two corporations is not apparent from the record. *See id.,* Ex. 2, at 14 (Capital One is a "client" of defendant).

[2] *Id.,* Ex. 1 at 54.

[3] *Id.,* Ex. 3, at ¶ 7.

[4] *Id.,* Ex. 3B, at 6.

began employment with defendant.

In accordance with Capital One's prohibition against self-dealing, customer service representatives who also are Capital One credit card-holders may not access their personal accounts. Instead, they must utilize the same toll-free customer service telephone number as all other Capital One card-holders. Capital One has four regional call centers to which inquiries are randomly routed, reducing the possibility that a customer service representative's call on her personal account would be handled by a co-worker working in the same call center.[5]

On August 17, 2000, a so-called "over-limit" fee — *i.e.,* a service charge for exceeding the account's credit limit — in the amount of $25.00 was waived on one of Brown's personal Capital One accounts. According to Capital One's records, the fee was waived from the computer terminal of Amanda Jones,[6] another SITEL Corporation employee assigned as a Capital One customer service representative in the Birmingham, Alabama call center. No incoming telephone number was recorded in connection with the change to Brown's account.

This change eventually came to the attention of the corporate security division of Capital One, located in Glen Allen, Virginia. On October 4, 2000, Bob Carpenter, a Capital One investigator, compiled and forwarded the information to Amy Ellard, defendant's Human Resources Manager in Birmingham, with a recommendation that Brown and Jones be interviewed about the waiver of the service charge.[7]

---

[5] Plaintiff's Exhibit List, Ex. 14, at 16. Capital One's information security program is known as *Info*Lock. Brown attended the *Info*Lock orientation program, designed to provide new employees with "the necessary knowledge to better secure Capital One's information resources," on December 9, 1999. Brief in Support of Defendant's Motion for Summary Judgment (doc. no. 17), Ex. 3A.

[6] Amanda Jones was misidentified as "Amanda Elkins" in the complaint. *See* Complaint at 1; Plaintiff's Exhibit List (doc. no. 20), Ex. 9, at 72.

[7] Brief in Support of Defendant's Motion for Summary Judgment (doc. no. 17), Ex. 4B.

Upon questioning by her supervisor, Craig Sullivan, the Operations Manager, and Amy Ellard, Brown denied approaching Jones to ask her to waive the over-limit fee on her account. Brown contended that she telephoned the customer service toll-free number to request that the fee be waived, but she did not know to which customer service representative she spoke, or remember the telephone number from which she had placed the call. She denied that she knew Amanda Jones.

Jones also was interviewed by Sullivan and Ellard, and she denied that Brown asked her to waive the over-limit fee. Both Brown and Jones were suspended while the incident was investigated. Sullivan and Ellard discussed with Melody Banks, the Regional Human Resources Manager, the information received from the corporate security department and the results of the interviews with Brown and Jones. Sullivan and Ellard recommended that Brown be terminated, and Banks concurred with the recommendation. Brown's employment accordingly was terminated on October 4, 2000.[8] Jones was allowed to return to work.

Following her termination, Brown applied for state unemployment compensation benefits. A hearing was held before an administrative hearing officer with the Alabama Department of Industrial Relations Hearings and Appeals Division on December 5, 2000. The hearing officer found that Brown had not committed a "dishonest act" in connection with her work, such that she would be disqualified from receiving unemployment compensation pursuant to Alabama Code § 25-4-78(3)(a).[9]

### III. DISCUSSION

Although Brown's complaint contains a claim of race discrimination under Title VII, there

---

[8] *Id.*, Ex. 4A.

[9] Plaintiff's Exhibit List (doc. no. 20), Ex. 7.

is no evidence that she satisfied the administrative prerequisites for bringing such a claim.[10] Moreover, she does not address the Title VII claim in her brief and, accordingly, the claim is due to be dismissed. Her claim of discrimination based on race under 42 U.S.C. § 1981 is thus the only claim remaining for discussion.

## A.   Motion to Strike

Defendant has moved to strike portions of Brown's evidentiary submission in opposition to the motion for summary judgment. Specifically, defendant requests that the court strike paragraphs 2, 3, 4, 5, 7, and 8 of Juanakee Sanders' affidavit,[11] paragraph 2 of Jamil Amison's affidavit,[12] and paragraphs 2 and 3 of Brown's affidavit dated July 30, 2001.[13] Defendant contends that the affidavits contain inadmissible hearsay, opinions, and conclusory statements which are improper under Federal Rule of Civil Procedure 56(e). The court finds defendant's arguments to be well-taken and persuasive, and the motion is due to be granted.[14] Accordingly, the court turns to the merits of defendant's motion for summary judgment.

## B.   Section 1981

Neither the filing of an EEOC charge of discrimination within 180 days of the alleged unlawful employment practice as required by Title VII, *see* 42 U.S.C. § 2000e-5(e), nor "resort to

---

[10] A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII. Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge.").

[11] Plaintiff's Exhibit List (doc. no. 20), Ex. 2.

[12] *Id.*, Ex. 1.

[13] *Id.*, Ex. 3. Brown also has submitted an affidavit dated September 23, 2001, which is not the subject of defendant's motion to strike. *Id.*

[14] It should be noted that, even if the stricken statements were determined to be admissible at trial, none (individually or collectively) would change the result.

Title VII's administrative machinery are ... prerequisites for the institution of a § 1981 claim."

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295

(1975).

> Congress did not expect that a § 1981 court action usually would be resorted to only upon completion of Title VII procedures and the Commission's efforts to obtain voluntary compliance. Conciliation and persuasion through the administrative process, to be sure, often constitute a desirable approach to settlement of disputes based on sensitive and emotional charges of invidious discrimination. We recognize, too, that the filing of a lawsuit might tend to deter efforts at conciliation, that lack of success in the legal action could weaken the Commission's efforts to induce voluntary compliance, and that a suit is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be. But these are the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies. The choice is a valuable one. Under some circumstances, the administrative route may be highly preferred over the litigatory; under others, the reverse may be true. We are disinclined, in the face of congressional emphasis upon the existence and independence of the two remedies, to infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted, as, for example, a proscription of a § 1981 action while an EEOC charge is pending.
>
> We generally conclude, therefore, that the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent. ...

*Id.* at 461, 95 S.Ct. at 1720-21.

Section 1981 generally is described as "a parallel remedy against [racial] discrimination which may derive its legal principles from Title VII." *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).[15] "When section 1981 is used as a parallel basis for relief with ... Title VII against disparate treatment in employment, its elements appear to be identical...." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) (citations omitted); *see also Standard v. A.B.E.L. Services, Inc.*,

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

Section 1981 is narrower than Title VII; it prohibits discrimination on the basis of *race* in the making or enforcement of contracts.

> The ... basis for a federal race discrimination claim by a non-employee against a private company is under 42 U.S.C. § 1981. ... Section 1981 provides that all citizens shall have the same right to "make and enforce contracts." The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace. ... This right extends not only to interactions between citizens and government, but to wholly private business dealings as well. ...

> Section 1981 requires proof of intentional discrimination. ... The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. ... Under the familiar *McDonnell Douglas/Burdine* framework, the court employs a three part test designed to determine the motivation of the defendant in taking the challenged action. ...

*Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) (citations omitted).

### 1.    McDonnell-Douglas framework

When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of

discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, 101 S.Ct. at 1096, then the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S.Ct. at 1094-95 & n.10. In the final step of the analytical process, the plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529.

## 2.   Plaintiff's prima facie case

Defendant alleges that the contested employment action was taken in response to Brown's on-the-job misconduct, but Brown asserts that the motivating factor behind the termination was her race. Brown bears the initial burden of establishing a prima facie case of discrimination.[16] She must demonstrate: *first*, that she is a member of a protected class; *second*, that she was subjected to an adverse employment action; *third*, that she was qualified to perform the duties of the job position from which she was discharged; and, *finally*, disparate treatment — that is, she was *either* (*a*) replaced in the position by a person outside her protected class, *or* (*b*) that similarly situated employees who were not members of Brown's protected class engaged in nearly identical conduct, but were not discharged. *See, e.g., Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998);[17] *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th

---

[16] The presentation of a prima facie case "serves an important function" en route to the resolution of the ultimate issue in every employment discrimination case: "it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 253-54, 101 S.Ct. at 1094. Having eliminated the most common non-discriminatory reasons for the contested employment action, a prima facie case thus creates a *rebuttable* presumption that the employer intentionally discriminated against the plaintiff,

> because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. ... And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (1978) (citation omitted); *see also, e.g., St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Burdine*, 450 U.S. at 254 n.7, 101 S.Ct. at 1094 n.7 (explaining that, as used in the context of the *McDonnell Douglas* analytical framework, the phrase "prima facie case" "denote[s] the establishment of a legally mandatory, rebuttable presumption"); *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998).

[17] The Eleventh Circuit's holding in *Jones v. Bessemer Carraway Medical Center* is founded in part on its prior opinion in *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989). In *Gerwens*, a black police officer was suspended for unauthorized use of a police vehicle, while white police officers who allegedly had committed similar offenses received less stringent discipline, or no discipline at all. The *Gerwens* Court explained that:

> [I]n cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not

Cir. 1984);[18] *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000);[19]

> violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540.

The *Gerwens* holding was questioned in *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, *superseded in part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998). In *Bessemer Carraway*, a black licensed practical nurse was discharged for violation of work-rules (*i.e.*, failing to wear required uniform to work, and failing to follow a supervisor's instructions), while white employees allegedly were treated more favorably despite similar conduct. The Eleventh Circuit wrote:

> Considering the facts in *Jones*, our impression is that words about "did not violate the work rule" are unnecessary to the decision in *Jones* and are dicta; but we will discuss them. The pertinent words in *Jones* demand not two, but three elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged — either (a) disputedly or (b) admittedly — in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.

> We stress that, under the *Jones* formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.

137 F.3d at 1311 n.6.

[18] The black plaintiff in *Nix* was fired from his job as a disc jockey for violating a company policy prohibiting moon-lighting at competing radio stations. 738 F.2d at 1183. The court held that:

> A prima facie case of discriminatory discharge may be established in different ways. One way is the method recognized by WLCY: a member of a protected class makes out a prima facie case if he establishes that he was qualified for the job, but was fired and replaced by one outside the protected class. ... But we have also held that a plaintiff establishes a prima facie case by showing that he was suspended or fired while others not in the plaintiff's protected class, "having comparable or lesser qualifications," were retained. ...

> Nix relies on a third version of the prima facie case, based on differential application of work or disciplinary rules. ... We have consistently held that a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows that he is a member of a protected class, that he was qualified for the job from which he was fired, and "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained." ... The prima facie case is established even if the plaintiff's replacement is also a member of the protected class. ... "The principal focus of [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole." ...

> Title VII does not "give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." ... Nor does Title VII allow an employer to escape liability for discriminatorily discharging an individual by maintaining an overall balance in the work force. ...

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185-86 (11th Cir. 1984) (citations and footnote omitted) (bracketed alterations in original).

*Lathem v. Dep't of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999);[20] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).[21]

The first two elements are not disputed:  Brown is an American citizen of African ancestry, and she was subjected to an adverse, "tangible employment action."[22]

---

[19] In *Alexander*, a case in which eighteen white current and former employees of the Fulton County, Georgia Sheriff's Department asserted race discrimination claims in violation of Title VII and 42 U.S.C. §§ 1981, 1983, the Eleventh Circuit considered the claims of those plaintiffs who contended they had been disciplined more severely than were black officers who committed similar offenses, and held:

> To establish discrimination in discipline, just like showing discrimination in hiring, a plaintiff must first make out a prima facie case demonstrating:  1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline.

*Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000) (citing *Lathem v. Dep't of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999); *Holifield*, 115 F.3d at 1562).

[20] In *Lathem*, a white female juvenile court intake officer was first suspended with pay, but later terminated for misconduct (*i.e.*, for becoming "personally involved" with a juvenile client, and then lying about the relationship when questioned by supervisors), while her supervisor — a male employee who plaintiff contended had committed more egregious violations of the Department's anti-fraternization rule — was not terminated.  172 F.3d at 789-90.  The court held that

> Title VII plaintiffs establish a *prima facie* case when they demonstrate:  (1) that the plaintiff belongs to a class protected under Title VII; (2) that the plaintiff was qualified for the job; (3) that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly.

*Lathem*, 172 F.3d at 792 (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

[21] In *Holifield*, a black physician initially was demoted from his position as Chief of Health Programs at a Florida state penitentiary to the status of staff physician, and later discharged, for misconduct (*e.g.*, unacceptable professional behavior).  He argued that similarly situated white physicians were not subjected to similar discipline.  The district court, in an opinion adopted by the Eleventh Circuit, 115 F.3d at 1556-57, held that a Title VII plaintiff establishes a prima facie case of race discrimination "by showing:  (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his [protected] classification more favorably; and (4) he was qualified to do the job."  *Holifield*, 115 F.3d at 1562 (citations omitted).

[22] An adverse, "tangible employment action" is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," or "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268-69, 141 L.Ed.2d 633 (1998) (citation and internal quotation marks omitted); *see also Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) ("An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.").

Defendant asserts that Brown cannot establish that she was "qualified," because she violated company policy by improperly accessing her personal credit card account and, thus, did not meet defendant's "legitimate performance standards."[23]

Defendant's argument is somewhat unusual.  Without question, defendant's decision to terminate Brown's employment is the gravamen of this controversy.  However, in termination cases — as contrasted with cases involving an employer's failure to hire or promote — the question of a plaintiff's qualification to perform the duties of her job is not often an issue.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  Even so, defendant appears to direct its "not qualified" argument solely to the matter of Brown's discharge.  This court must consider whether Brown was qualified to perform her duties as a customer service representative at the time of her discharge, and, in doing so, follows the rationale of the Eleventh Circuit, which has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987).

The evidence establishes that Brown worked for defendant for almost a year, and received two performance appraisals during her tenure.  The first, dated February 21, 2000 and described as a three-month review, reflects that Brown's performance met the expected standards.[24]  The second, a six-month review completed in June of 2000, reflects that Brown's performance exceeded the expected standards.[25]  Defendant has submitted no other evidence that Brown was not qualified to perform the duties of a customer service representative.  Thus, the court finds that Brown has

---

[23] Brief in Support of Defendant's Motion for Summary Judgment (doc. no. 17), at 11-12.

[24] Plaintiff's Exhibit List (doc. no. 20), Ex. 4.

[25] *Id.*, Ex. 5.

satisfied this element of the prima facie case.[26]

### a.    Replacement by person outside protected class

Plaintiff has failed to demonstrate that, following her termination, she was replaced by a person outside her protected class.[27]

### b.    Disparate treatment of similarly situated employees outside protected class

Brown contends that she was treated differently than Amanda Jones based on the same incident of misconduct. Amanda Jones is white and, while she was suspended along with Brown pending an investigation into the fee waiver incident, she was not discharged. Brown makes much of the correctness of defendant's decision to terminate her and, in essence, denies that she violated the company's policy. Brown's argument misses the point.[28] *See Bessemer Carraway*, 137 F.3d at 1311 n.6 ("[N]o plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better."), *superseded in part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998).

---

[26] This court construes defendant's argument that plaintiff was not qualified as going more to the credibility of the stated reasons for defendant's adverse employment action. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) ("[A]llegations of poor performance against plaintiffs discharged from long-held positions may be properly considered ... when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.").

[27] Plaintiff's Exhibit List (doc. no. 20), Ex. 10, at 4 ("It is impossible to determine which specific employee replaced Plaintiff as those positions are filled from a pool of available applicants. However, the pool generally consists of approximately 70-80 percent African-Americans.").

[28] Brown offers the Alabama Department of Industrial Relations administrative finding as evidence that she did not violate a work rule. Plaintiff's Exhibit List (doc. no. 20), Ex. 7. Even if this court were to find that the report would be admissible at trial, *see* Fed. R. Evid. 803(8) (hearsay exception for certain public agency reports), the report does nothing to advance Brown's task of identifying a similarly situated employee who engaged in nearly identical conduct, but was not discharged.

Brown asserts that she and Jones are similarly situated.  Defendant acknowledges that both Brown and Jones were customer service representatives who performed the same duties and worked under the same supervisor, and that Jones, who is white, was not discharged by defendant following the investigation into the over-limit fee waiver incident.  Defendant argues, however, that Brown and Jones may be differentiated as follows:

> SITEL was unable to establish any evidence indicating Jones was involved in any dishonest conduct.  Both parties acknowledged they have never conversed or conspired to remove an over-limit fee from Plaintiff's account.  Moreover, Plaintiff acknowledges that she took volitional steps to remove the over-limit fee from her own account.  Therefore the only way Jones could have been involved in this transaction is if Plaintiff dialed the toll-free automated number and contacted Jones via the telephone.  However, since Capital One's computer monitoring system did not provide evidence of an incoming call on Plaintiff's Capital One account, Plaintiff was terminated from her employment with SITEL.[29]

More simply put, defendant contends that because a determination was made that Brown had violated company policy, but that Jones had not, Brown and Jones cannot be said to be similarly situated.

From the fact that an over-limit service charge was removed from Brown's account without a record of a corresponding telephone number, three logical inferences may be drawn.  The first is that Brown called the toll-free customer service number to request that the fee be waived, but that the computer malfunctioned and did not record a telephone number.  Brown does not contend, however, that this was the case, and there is no evidence before the court that the computer malfunctioned on August 17, 2000, or that it had ever malfunctioned.  Moreover, Brown testified that she did not remember the telephone number from which she placed the call, even though the $25 "over-limit" fee charge was removed from her account balance on a date, and during a time of day,

---

[29] Brief in Support of Defendant's Motion for Summary Judgment (doc. no. 17), at 15 (citations to the record omitted).

that Brown was at work in the Birmingham call center.  The second inference that may be drawn is that Brown asked Jones to remove the over-limit service charge from Brown's account, and that Jones did so.  If that were true, defendant's disparate treatment of Brown would be actionable. Notwithstanding, *Brown denies even knowing Jones* (and, in fact, misidentified her in the complaint as Amanda Elkins).  The third inference — and the only inference not negated by evidence presented to the court — is that Brown accessed Jones' computer terminal to remove the over-limit fee.  Only Brown would be culpable for such conduct, and not Jones.  Brown has accordingly failed to demonstrate that she and Jones are similarly situated.

Finally, Brown has identified no other employees outside her protected class who engaged in nearly identical conduct, but received more favorable treatment.  In the absence of "detailed and precise facts," Brown cannot avoid "the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Accordingly, the court concludes that Brown has not established this element of the prima facie case, and her claim must fail.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this **30th** day of November, 2001.

United States District Judge